Good morning, ladies and gentlemen. Our first case for argument is Pittman v. Madison County. Mr. Anderson? Yes, I'm ready when you are, Your Honor. The primary issue in this case is the exclusion by the trial court of Exhibit 2A, which is a contemporaneously recorded video exhibit of the only witness in the case. The witness characterized by the defense in their opening statement incorrectly so as the star witness to our allegation that the custodial guards failed to heed Mr. Pittman's request to seek crisis counseling and ignored that and did so in a very deliberately if not an outright intentional way and he attempted to hang himself and became brain damaged. The statement itself was contemporaneously recorded three hours after the event. It was recorded and taken by the jail detective, Joshua Presson, who was also a witness and who authenticated the statement as did Mr. Banavese, Bradley Banavese, the witness who also authenticated the statement to be as the transcript as the original. This statement is the case. It contains the substantive information that gives rise to the liability against all the defendants through the two named defendant security guards, defendant Deputy Warner and defendant Eaton. It contains what I thought was most important and if the court reviewed the transcript, I just kept going back to it, a sharp and definitive contrast between the demeanor of the witness, Banavese, at trial. He was a flippant witness. He showed up. He, a couple of the things that are actually on the record, he said, I am a fast reader and laughed about it and then took a half hour to read a 12 page document. He accused the defendant's witness without a question pending of studying their statement out in the hall and said, you know, things like that that were just absolutely not unanticipated in a witness like that, but just absolutely flipped. And he was just a train wreck, really. Frankly, my entire strategy in this case was I didn't care what Bradley Banavese said or how he acted at trial as I went in. For months before the pretrial conference, I had discussed with Attorney Gilbert the admissibility of this statement. Now, to tell you who Attorney Gilbert is, he has handled more of these cases down there representing the Madison County Jail, or at least as anybody. And he knows what comes in, and he knows what's going to come in, and he knows why it comes in. And he told me outright, I'm not going to fight that battle. We are going to admit the statement, and you may play it. And the truth of the matter is, he also told me that you may play it right away, and that's a strategy determination that all defense lawyers make. Well, if you play that statement early in the case, maybe the jury will forget about it after the whole case goes through, and you put things on, and it's out there, and it blunts the effect of the statement. My analysis of this case early on was that Exhibit 2A had to be admitted and played to the jury for us to have any chance of prevailing, and that issue was gone months before the case. How long is the tape, or whatever it is? Twenty minutes. Twenty-five minutes. Very brief. So you wanted the full 25 minutes? One of the full 25 minutes. It wasn't abusive. It was direct and to the point. Detective Presson didn't go into any extraneous manners. When Mr. Benefiz mentioned that he had seen the two guards talk to Mr. Pittman about a request for crisis, and that they ignored that request, Sergeant Presson honed in on that, asked further questions on it, and it was just an absolutely short, sweet, and rational version of events. Wasn't his testimony very similar to what was on the video? No. It really was not. First off, the demeanor was wildly different, but secondly... Well, what do you mean by that? Well, he was just a flip guy. He came in. He hadn't read anything. You mean his live testimony? His live testimony, and to begin with, his live testimony, he came in and indicated that he had the first thing out of his lip, I have no recollection of the day that Matthew Warner talked to Mr. Pittman. Well, that was a key for all the expert testimony and all of the subsequent testimony. Mr. Pittman attempted to hang himself on December 19, and the day that this conversation took place was the Friday before, December 14. So the fact that he didn't remember how many days before was bad. He didn't recall the conversation. The impression that he made to the jury is, I don't know what's going on. He could not recall any of the events of the conversation between Mr. Warner and the plaintiff, Reginald Pittman. But did you show him his video? I showed him the transcript. The judge excluded the video, and I argued that that really was an error because they don't get to see the difference. There's information on this video about nonverbal information about his demeanor, and that he was upset and that he was telling the truth, I think, apparent from this video, and the judge, for some reason, didn't want to let that in. Did he give a reason, the judge? The judge actually said, and it's on page 145, and this is after, on page 128 and on the pages from 121 to 122, the second day of trial, that Banovi said, I don't remember the conversation at all, the key to the case. And then he said, I don't remember the conversation with the other security guard, Sergeant Randy Eaton. And the judge actually stated then in her ruling, I don't think you have shown enough lack of recollection for past recollection recorded. She also said, as the court reviews the transcripts, I was raising heck from start to finish about the stipulation. Attorney John Gilbert admitted the stipulation on the record that this would be played. He admitted it on page 11. He admitted it in a pro forma objection that was sustained on page 92. He then admitted it on page 147 of the second day of trial that I did say that, and I understand why Mr. Anderson thought the video would be played. And I think the most telling thing was that on page 92, when he did his pro forma objection, I'm just objecting for the record, Your Honor, but I know he's going to be able to play the statement. And that was his objection. I know he's going to play it. I just want to make an objection for the record. He knew that was coming in through the stipulation. And the most surprised guy in the courtroom, other than me, that the judge sustained this objection in the presence of this stipulation that was admitted three times and then again on a fourth, on day six, a fourth time, was that the judge sustained this objection. That, just out of the blue, what in the heck? And I argued vociferously, the court for the regular administration of justice, because lawyers have to be held to their agreements. Because there is just nothing that would prevent this from coming in that the videotape has to come in on the stipulation. The judge said in response to that directly, and she was just wrong on the law, I am not in a position as a judge to enforce an agreement between the parties to admit evidence. Did she know, had she seen the statement? She saw the transcript. We had that there. And we actually had exhibit 2A on the video machine and were going to play it. I said, had the judge seen that? She had not seen the video before, but she had seen the transcript before. And then you had the transcript when, is it Banov? Yes. When Banov was testifying, were you able to use the transcript to remind him what he said back then? Right. But he was reasonably bad about refreshing his recollection. So if the court would compare the transcript versus what the statement actually contains, there were many pertinent parts. One of the key parts is that Banovese, in his statement immediately afterwards, said, look, I confronted Matthew Warner on the 14th. And basically, he implied that he told Matthew Warner he was lying, because Matthew Warner came in and said, look, I promise to put you on crisis as a result of your request, but we're going to defer that until Monday. Well, every witness in the case, the jail witnesses, the experts, every witness, defendant's experts, said that's deliberate indifference. If you've already made a decision that this individual needs to see crisis, and you have come forward, and now you're going to delay that until Monday. And Banovese confronted Warner and said, look, I know you're not working Monday. I know you're not on the schedule. And that's on the statement. And then over the weekend, two other guards, according to Banovese, were advised that he was, by Banovese, that you better watch out for this guy. I think this is serious, and he might try to commit suicide. They did nothing. And then, according to Banovese, Eaton was also advised that he needed to see crisis on the 18th, and he did nothing. A jury could reasonably conclude, and particularly from these three events, that the guards had something going on with this guy. That they were not going to listen to his request. That they thought he was full-blown. Or at least that they were just as negligent as they can possibly be because of these issues. And every expert and every witness says this is a violation of procedure. Initially, Banovese. Excuse me, what day did he actually attempt suicide? 19th. What day of the week? It was a Wednesday. Okay. So we're referring to on a Friday, you're going to do this Monday, and it's the Wednesday when he attempted to hang himself. Correct. Could I take you back? When was the first time that the video came to light to you? Oh, early in the case. That's why I decided to go forward with the case. And then what happened? It said there would be no objection. They didn't agree. They didn't stipulate to it. Sure they did. They did stipulate to it. You bet. And he acknowledged it. And the stipulation is on the record three times. But it wasn't just I won't object. It was a stipulation to let it come to light. A stipulation, you may play the video. The stipulation at trial, he changed it a little bit at trial and said, I'm going to change it. I'm going to require that Banovese be present. So we immediately changed the order of witnesses, and we got Banovese in here, and that went along with his idea. He wanted this video played earlier. If you look at page 11, if you look at page 148, he's all over the place acknowledging that he made this stipulation. He actually says, I can see why Ross would believe that this is going to come in. How did the district judge set it up? Did she have a list of exhibits that were going to come in? No. We did our objections and our briefs a month earlier on the objected two exhibits in our February 4th pretrial, and we had some hot arguments. And this thing we didn't need a party address because there was a stipulation that was going to come in. What happened is the judge just didn't know the law. She said she's not in a position to enforce this stipulation, and the law is just the opposite. The court, the trial court, is bound by stipulations of this sort unless there's manifest injustice under the law of the circuit. And she said, I'm absolutely not, even though the stipulation is admitted. What happened then is she didn't assess the manifest injustice. The only intervening event, he acknowledged the stipulation an hour before she ruled against it. And the only intervening event is she made a ruling that she thought it was hearsay. And I know what happened is John went back to his clients. He says his clients instructed him not to. Well, his clients are a couple of security guards and an in-house insurance agent who is a lawyer. They didn't know anything about this. It's almost absurd. He went back and he said, by God, if I object, I'm going to be able to keep this thing out, I think, by the way the judge is ruling. And the judge actually said on page 148, when I was trying to get it in with past recollection recorded, she actually said she was so dead set against the statement, she actually said even if you put the foundation out there, that does not mean this is going to come in. Now, I have no idea why she took that view, but if you look at page 148, that's what she said. The facts in that statement are the facts that we were using to reflect that, well, it's a whole case. The jail superintendent, Captain Goulash, Nurse Onfrey, Renee Stevenson, all said that if the facts in the statement are true, it constituted deliberate indifference. Dr. Kahn, our doctor from California, actually said that it added an extra element because both these guys promised that they were going to refer him to crisis, and that puts additional psychological pressure on the guy because he thinks crisis is coming and that they're messing with him, which is what he said in his suicide note. I told the guards about this, I want to see crisis, and they're effing with me, is what he said, and they think I'm joking and what have you. And then there's much testimony about the joking nature. Judge, with respect to the rest of the case, I also want to bring up briefly, before I sit down, the supplementary report. We had a supplementary report that was the subject in the pretrial conference of much dispute. It was 11 months earlier. One of the defendants, a defendant, Eaton, wrote a supplementary report where he had for a year not referred anybody to crisis because he thought somebody was joking. Joking was referenced in the suicide note. That's why the guards aren't playing to us. And the guy actually said... It's a different inmate? Another inmate. And also they said the policies that we would never do this. Every witness said we would never do this. And Mr. Eaton said I would never do this and I assess everything. And then he wrote to the Bureau of Standards on the thing 11 months earlier and said I didn't take his threats of suicide seriously because I thought he was joking. The judge excluded that as too remote. If there's anything that is just right on, it's that. And furthermore, he had ignored depression remarks for a year before that because he was joking. I took more time than I thought. Judge, I'd like to reserve the rest of the time for rebuttal if I may. Thank you. Okay. Thank you, Mr. Anderson. Mr. Sansone. May it please the Court. We have to look at the big picture. This is a deliberate indifference case. It's a case about whether a prisoner who ended up attempting to commit suicide unsuccessfully had asked for crisis intervention and whether that was ignored and whether that was ignored in a deliberately indifferent way. That's the question. That's what we have before us. That's the big picture. This was an eight-day trial. You're saying he didn't ask for crisis intervention? There was evidence that he did. The suicide note itself was literally Exhibit 1. And in Exhibit 1, he indicated that he thought he wasn't being taken seriously. That was in front of the jury. That was over our objection. So plaintiff's theory was there. Are you saying he didn't ask for crisis intervention? I'm saying that the jury apparently either believed that. No, answer my question. Yes, Your Honor. I don't know, Your Honor, whether he did or not. I know that he did say in his suicide note that he asked for it and he felt that he was ignored. I do know that. Whether he actually did make the request or not, I don't know. I know there was evidence both ways. And I can only assume that because the jury ruled in favor of the defense, that it decided, based on all the evidence heard after eight days, that either he didn't make the request or, if he did make the request, the guards did not believe that there was a risk of imminent suicide. How can a guard make a judgment of that sort? That strikes me as totally irresponsible. Well, Your Honor, I'm sorry. Don't interrupt me. The prisoner complains he needs to see crisis intervention. No way a guard knows whether that's serious, honest, fake. The guard has to report to someone. He has to tell his boss or has to tell or ask his crisis intervention office. What should we do? You'd think the crisis intervention people would want to at least speak to the guy, right, and find out what is he complaining about and why. They can make a judgment. The guard can't make a judgment. This court in Pittman 1 said that a crisis request in and of itself is not enough to cause a guard to have to do that, Your Honor, with respect. And also Dr. Kahn. No, that's not what I'm talking about. If a prisoner makes a complaint of this sort, says he wants to see the shrink or something, the person to decide whether that's a legitimate request are the people who deal with these problems of prisoners. It's not a guard. Again, Your Honor. What does a guard know about the mental state of a prisoner? In Pittman 1, this court said that this You give me a reason, not a case. Dr. Kahn, the plaintiff's expert, said that a request for crisis intervention in and of itself is not enough. That was the plaintiff's expert who said that. Why? Because if you simply require a statement by an inmate, I want to see crisis in and of itself as enough to require the guard to do that, you're essentially setting up a strict liability standard where if there's any request like that, it just has to be done, period. There's no discretion for the corrections officer, and that's not the law. Well, what's the problem with having one of these crisis intervention people speak to the guy? Well, let's look at that video. I think the best way to answer that question is to look at what the inmate Bannabas actually said  Let me look at the video. The video wasn't admitted in the trial. You want us to make a decision on the case based on evidence that wasn't at the trial? The best thing I can say, Your Honor, is every situation... What are we supposed to do with the video? Are we supposed to make our own judgment? No, I... Why wasn't the video admitted? The video wasn't admitted because Judge Yandel thought that it was hearsay and that she wasn't required to accept a purported stipulation, that she could still look at it independently and make her own decision as to whether... It wasn't a purported stipulation. It was a stipulation, right? Your Honor, I'm not clear from the record whether there was a stipulation or not. I think the record is unclear, and Judge Yandel stated as such when she made her ruling. She referred to it as a purported stipulation. Well, according to Mr. Anderson, she thought she didn't have the authority to allow the stipulation. She did say that. She also referred to it as a purported stipulation in the record. So she indicated some... Well, that sounds like total confusion to me. It sounded to me, Your Honor, from the record like she wasn't sure whether there was a stipulation. But that's ridiculous, right? Of course she could enforce the stipulation. I don't know that a federal... What is the basis for thinking that a judge can't enforce a stipulation? If a judge has concern about evidence, I don't think that he or she is... That's not the question. What makes you think a judge cannot enforce a stipulation between the parties in a trial? There's nothing that prevents a judge from allowing it in. Right. So she screwed up. I don't think that she did, Your Honor. Yes, she did. Because she said she couldn't enforce the stipulation, and she can, as you admit. That's a screw-up. A judge doesn't know her authority. Getting back to what I was saying at the beginning, Your Honor, there was eight days of testimony. Why wasn't the video admitted? The video wasn't admitted because there was an objection made, and the judge sustained the objection. That's not a reason. That's not reasoning. That's just saying what happened. The question is, what is the reason for not admitting the video? The reason for not admitting the video is because it was hearsay. It was an out-of-court statement, which was an attempt to be admitted for the truth of the matter asserted. But let's assume... You know, of course, hearsay is not automatically inadmissible. True. Right? That's true, Your Honor. So was there a dis... What is it, Rule 807 or whatever that allows hearsay to be admitted if it's reliable? Yes, that's right. Was that issue addressed? It was, Your Honor. The evidence was offered for various reasons, as an excited utterance and on other grounds. The judge found that she disagreed with the bases that were stated for allowing it in. Why? She found that it was not an excited utterance because there was no indication of excitement. Well, forget the excited utterance. I'm talking about reliability. Sure. So it was unreliable, why? It was made three hours after the incident. He was sleeping when the attempted suicide occurred. That is, inmate Benevitz was sleeping when the attempted suicide occurred. He was someone who had been in this facility 50 times, and he had reason to reflect. He had time to reflect before he made a statement three hours after the incident occurred while he was sleeping. Those are some indicators of unreliability. But if we assume for a moment that the video should have come in, we have to look at the question of, would it have made a difference for the jury? And the answer is no, and I'll tell you why. If the video had come in, the jury would have heard a question from the detective, so the guards treat him pretty good? Yeah. Nobody talks down to him? I mean, disrespects him? No. And then he was asked, he also said, all the guards have been real cool with him. Then he was asked, has Reggie, that's Mr. Pittman, has Reggie said anything to you that would indicate that he was suicidal when you were talking about hurting himself at all? He made a comment one time, but it was just a joke. But he was like, I'm going to kill myself today, you know, like just a ha-ha laugh manner. This is all from the video? Yes, Your Honor. And there's no indication to whom Mr. Pittman said that. There's no indication that Mr. Benevitz himself then said to a guard, hey, I just heard Mr. Pittman. So you're saying the video really supports your side of the case? I do, Your Honor. So why did you object to it? In hindsight, perhaps the objection shouldn't have been made. But yes, my position is that even if the video had come in, it wouldn't have made a difference for the jury. So why did you object? I can't speak for Mr. Gilbert, but I believe that Mr. Anderson is accurate when he says that the client indicated at a certain point during the trial, during a break, that he had reservations about letting the video in. I believe that's accurate. Which client, the insurance company or the prison? That I don't know, Your Honor. I don't know one way or the other. It doesn't sound like one. But we still have to look at whether there was prejudice. And if you look at the transcript, and I've studied it carefully, I've also listened to the audio. If anything, Judge Posner, as you indicated, it may have been helpful to the defense. I certainly don't think that the video would have caused the jury to do anything differently, and that's the bottom line. Even if the court believes that the video should have come in, either because of a stipulation or otherwise, it has to make the determination whether there was prejudice. In this video, I'm sorry, this video, if anything, is helpful to the defense, particularly to the extent that I read portions of the transcript to you just now. Remember, it's a deliberate and different standard. Mr. Banovitz, the inmate, indicated that the corrections officers were actually treating him well. No one disrespected him. They were cool with him, real cool, as he said, using his words. So the deliberateness there that needs to be there is not present. The willfulness, the wantonness, those are all part of the verdict director that's not indicated here. At worst, at worst, and I'm not conceding this, but at worst it was perhaps negligence, but deliberate indifference is not a negligence standard. I don't think it was negligence. So plaintiff didn't make his case. Plaintiff had eight days' worth of evidence, and in one form or another the evidence came in. I think the best indicator of that is the suicide note. The fact that Mr. Pittman himself got to speak, if you will, by virtue of his suicide note to the jury, telling what he thought happened, and the jury found that there was no deliberate indifference, I think that's powerful. I mean, he indicated he felt he wasn't taken seriously. That's what his suicide note indicates. The jury got to hear that, but the jury still found there was no deliberate indifference. I would think that any time a prisoner talks about suicide, whether it sounds like a joke or it sounds serious, given the long history of jail suicides, the guards would report this to the crisis staff, let someone talk to them. Not just ignore it and treat it as a joke. That's irresponsible. Also, you did stipulate that they could play the video, right? And then what? You withdrew that stipulation or canceled it. Why'd you do that? You think it helped you? I mean, if you think the video would have helped you, why'd you want to keep it out? I mean, you agreed to let it in. I believe Mr. Anderson is accurate when he says that at some point the client had reservations and asked Mr. Gilbert not to allow that in. That's my understanding. What were the reservations? That I don't know, Your Honor. Isn't that important? To know why the client asked the lawyer to withdraw his agreement, the stipulation? It would be helpful to know so that I could give you an answer now, yes, Your Honor. Well, you're stuck with arguing this case when you weren't the person making those decisions. I understand that. I wouldn't say that I feel stuck with it. That's the way it works. I'm sorry to interrupt, Your Honor. I wouldn't say that I feel stuck with this at all. I mean, I felt it was an honor to write the brief in this case and to be free. Well, the person that could answer the questions that we've been asking is not where you are right now. That is true, Your Honor. That's the right answer, though. Anyway, what's his status now, Pittman? Unfortunately, he has severe brain damage, and there's no question he sustained an injury in the attempted suicide, and there's no question that he's in bad shape. Is he in some institution? That's my understanding, Your Honor. And obviously, that's a very costly condition right now, right? It is. Who's paying for it? The taxpayers are, Your Honor. Mr. Anderson also addressed the supplementary report that was written by Mr. Eaton approximately 11 months earlier that did involve an earlier inmate, as you referenced, Judge Mannion. So these guards impose significant costs on the government. That's not the way that I see it, Your Honor. The way I see it? Over eight days. That's what they did. They treat it as a joke. It may have been a joke. That's the sort of thing when people joke about certain matters, you take it seriously. You worry about it. A guy in a prison, a guy in a jail, starts talking about suicide. Yeah, joking. Who knows where it leads? People are unstable, many of them. Guards are just jokers. The jury got to hear from both of the guards. The jury, yes. The jury heard from both of the guards. They testified. Yeah, I agree. And inmate Banovitz also testified. It's easy for the guards to testify and say, yeah, we thought it was a joke. But the jury is entitled to believe that. The jury is entitled to believe what they said. I don't think they are. Because I think it is extremely irresponsible for guards to be treating any talk of suicide as a joke. What kind of people talk about suicide, joke about suicide? Judge, the jury got to hear a lot of evidence over eight days. They got to assess. This was not well administered by Judge Yandel. I think that she did a fine job. She did not do a good job. That business about she has no authority to enforce stipulation, no, that's wrong. That shows she doesn't understand the powers of a federal judge. Even if so, we have to look at whether the video would have made a difference and it wouldn't have in this situation. There's no deliberateness here. Even if you believe that the guards heard the word suicide and should have referred him, you still have to find willfulness and wantonness. You have to find deliberateness. You have to find that they had some animus here or something of that nature. And that evidence is just not on the record. You can't speculate on how the jury would have reacted to the video. They might have thought the video was more authentic than someone who comes up and testifies in a trial. I thought, yeah, he didn't have an ax to grind. He wasn't a witness. How many times in the, I know there's, whatever the testimony would have been, eight days, but there were other times that Pittman talked about suicide, weren't there? He referred to, yes, Your Honor. He referred to it, according to inmate Banavitz, it was referred to a few days before the attempt occurred. And that was the reference that I made earlier from the transcript, Exhibit 2B, in which inmate Banavitz said he made a comment one time, but it was just a joke, joke, but he was like, I'm going to kill myself today, you know, like just a ha-ha manner. That was made a few days before the incident occurred. My question really was, had Pittman earlier, some weeks, months, whatever, said something about suicide to anyone that's record? No. There's nothing in the record that indicates that either of the two guards heard a comment from Mr. Pittman to that effect. Well, they did testify to some extent where the suicide issue was raised. They, I don't want to say anything's automatic, but they are required then to report this to Crisis or whatever it is, the internal, which crisis? Right, to Crisis Intervention, Your Honor, yes. The testimony from Mr. Eaton was that each case is looked at on its own, based on the circumstances. There is no requirement that every time a crisis request is made that it be referred to Crisis Intervention. There's testimony in the record of that effect. He indicated that each situation is looked at on its own. There's not a hard and fast policy that if a request is made, then boom, you have to go. That's not the way that it works. And what was their testimony in this situation? In this situation, that was Mr. Eaton's, one of the guards' testimony, that based on what he had heard from Mr. Pittman, this did not appear to be an appropriate situation for referral to Crisis Intervention. What's the size of this jail in Madison? It houses, I'm not certain of the size, Your Honor. Approximately. It's a fairly large facility as far as county facilities go, I can say that. But in terms of the number, I wouldn't want to speculate. Do the lawyers and other staff in your office joke about suicide a lot? No, we don't, Your Honor. So based on the fact that Mr. Anderson focused on the video, he talked a little bit about the supplementary report, which I also talked about. I know nothing else was discussed. I would just submit on the remaining points to go on the briefs to save the Court a little bit of time this morning, and I thank you for your time this morning. Okay. Well, thank you very much, Mr. Sandshaw. Mr. Anderson? Yes, Your Honor. When do you get here? I'm sorry, Judge. I beg your pardon. That's an old trial lawyer habit that's terrible. I want to correct a lot of things that are being said here. The first off is Mr. Pittman's benefits have now been cut off, and his mother is taking care of him 24-7. And she has to wake up four times a night to suction him and do various things like that, and it is a true tragedy. She's taking care of him in the home? In the home. There are no benefits anymore for me. Why, I don't know. No government money? No government money anymore is going to Mr. Pittman. With respect to the statements that were made, that the client made the decision, I just think that I thought that was facetious at the time, and I think that John just saw that the judge was looking like she was going to keep it out, and that's what he did. And she was wrong about the law. One of the things that the court has raised here is the suicide statement. Bannevies testified generally that statements were being made to him, but he also said that I told two guards over the weekend that there were suicides. Everybody has said in this record that that's an automatic. The court in the previous version in Pittman said that may be submitted on a state law claim, and Judge Yandell said no. And we had, off the record, an extensive colloquy, but on the record you can see I tried to submit that as jury instructions against these guards, and she just refused that, so I was not able to argue the suicide communication from Bannevies to these guards to the jury, and it's a direct violation of the law of the case. Were these your different guards? Different guards. We had three sets of guards. We had Werner, who was playing with him. I think every reasonable person, if they actually heard it, in not an impeaching way. You know, when I was trying to do foundation, that actually served as impeachment because that video never came in, and it really was a train wreck the way this thing came in. And then John Gilbert did just a brilliant cross-examination on this guy's credibility like you wouldn't believe from the opening statement on. Judge Yandell was wrong that that opening statement didn't serve as a basis for me to bring it in under past recollection recorded. Those are admissions. Counsel binds his clients. She said, no, they're not, and he went all over the criminal record, and that thing came in under past recollection recorded. I want to say that I made a mistake in my first brief. The decision to enforce a stipulation, this court reviews de novo and not as an abuse of discretion, and I simply corrected that in my brief. With respect to the state claim, that's just wrong. He cherry-picked the patient parts of that statement that he felt helped him. I mean, my God, Benavise comes in and says that he confronted Werner and said, look, you're promising to go to crisis, and you know you're not working on Monday. And that we brought it out kind of by me forcing it through with past recollection, but it was the biggest train wreck of all time. And the proof is in the pudding, Judge. What was this jury hung up? I wasn't getting my evidence in, and dadgum, they hung up anyway. And the jury, what's the one piece of evidence that the jury demanded to see in order to resolve its differences? This statement. They actually sent a letter out to Judge Yandel and said, I want to see the statement. If there is ever a case where the Exhibit 2A is a critical piece of evidence, it's this. With respect to the room, I have a few other things that, you know, I've cited all the rules, and I think she was wrong on virtually all of them. What's wrong with this coming in under present sense and pressure? The argument I was making through all the way through this was this shows its demeanor. Judge, it's a piece of information that's in this recorded statement that is authenticated and real. Why doesn't it come in just for that so the jury can assess these things? My whole strategy in the case, because I didn't care what Banavese said, was the contrast. When I was going to present this case, I was going to say, all right, Mr. Banavese is an inmate and he's a rough customer, but look at the difference between his demeanor on this statement and his testimony here in trial. And I think that would have been spectacularly powerful evidence. Okay, you'll have to wind up. All right, Judge. I just wanted to say she also excluded the testimony of the guardian, one of the co-guardians, the bank, because she says that's irrelevant. Well, I think the jury needs to know that info. They need to know that mom is not going to have sconed with the money, and relatives aren't going to have sconed with the money. They need to know the bank is going to put it in a trust. That's all we wanted to do. I know I'm forgetting something. Oh, and I do think that if there was ever a case, and I think it's very rare, and most lawyers don't even include it in their notice of appeal, but if there was ever a manifest weight of the evidence, if you really take into account the evidence that suicide was mentioned by And the guards themselves said, we have no recollection of this, in contrary to what he says. If there was ever against the manifest weight of the evidence, I think it's this case. But the truth of the matter is the jury wanted to see that statement, and they were fighting and wrestling back there, and they didn't get it. When you say the jury was hung up, you mean it took a long time? No. They actually sent a note out and said, we cannot reach agreement. Was there a mistrial? No. Well, Judge Shiano gave them a mild hammer. What? And they came back. What did you say? Gave them a mild hammer type of instruction that said you have to decide your case based upon the instructions and the evidence before you, and she also told them that she's not going to send the statement back. And then they decided after almost two days for the defense. Okay. Well, thank you very much. Thank you, Judge. Move on to our next.